IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DONNA JEAN MORRISON,

      Plaintiff,

  v.                                      Civil Action 2:16-cv-1061
                                            Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## OPINION AND ORDER

Plaintiff, Donna Jean Morrison, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. For the reasons that follow, Plaintiff's Statement of Errors (Doc. 14) is **OVERRULED**, and judgment is entered in favor of Defendant.

I.   **BACKGROUND**

    **A. Prior Proceedings**

Plaintiff filed for disability insurance benefits ("DIB") on September 6, 2013, alleging a disability onset date of March 1, 2001. (*Id.*). Her earnings record shows that she acquired sufficient quarters of coverage to remain insured through March 31, 2006. (Doc. 13-3, Tr. 65, PAGEID #: 124). Plaintiff's claim was denied initially on December 17, 2013 (Doc. 13-4, Tr. 83, PAGEID #: 143) and upon reconsideration on March 31, 2014 (*id.*, Tr. 89, PAGEID #: 149). Administrative Law Judge William Spalo (the "ALJ") held a video hearing on September 14, 2015 (Doc. 13-2, Tr. 23, PAGEID #: 81), after which he denied benefits in a written decision on October 28, 2015 (*id.*, Tr. 7, PAGEID #: 65). That decision became final when the Appeals Council denied review on September 14, 2016. (*Id.*, Tr. 1, PAGEID #: 59).

Plaintiff filed this case on November 7, 2016 (Doc. 1), and the Commissioner filed the administrative record on January 2, 2017 (Doc. 13). Plaintiff filed a Statement of Specific Errors on February 27, 2017 (Doc. 14), the Commissioner responded on April 11, 2017 (Doc. 17), and a Reply was filed on April 25, 2017 (Doc. 18). Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, and upon consent of the parties, this case was referred to the undersigned to conduct all proceedings and order the entry of final judgment. (Docs. 15, 16).

### B. Relevant Testimony at the Administrative Hearing

At the start of the hearing, the ALJ discussed with Plaintiff her right to representation:

ALJ: When we first received your case in the hearing office here we wrote you a letter advising you of your right to representation . . . That notice listed phone numbers for various legal groups which may be able to assist you finding legal representation, such as the State Bar Referral Service, or Legal Services offices. The letter also told you there may be free legal services available to you. Do you remember receiving that letter in the notice?

CLMT: Yes, sir.

ALJ: All right. I need to ensure on the record that you understand your rights to representation. You have the right to be represented by an attorney or a qualified non-attorney. The representative can help you obtain information about your claim, submit evidence, explain medical terms, help protect your rights, make any requests, or give any notice about the proceedings before me. The representative may not charge a fee or receive a fee unless we approve it . . .
Do you understand your rights to representation?

CLMT: Yes, Sir.

ALJ: Do you want to proceed today without a representative?

CLMT: Yes, sir.

(Doc. 13-2, Tr. 26–27, PAGEID #: 84–85). Following this exchange, Plaintiff signed a waiver of right to representation acknowledging that the ALJ had explained her rights, that she understood them, and wanted to proceed. (*Id.*, Tr. 27, PAGEID #: 85).

Plaintiff stated at the hearing that she had an opportunity to review the record and informed the Court that she brought additional records from Dr. Kenneth Saul, dating back to 1998 (and totaling 153 pages), that illustrated her back problems, diabetes, and depression. (*Id.*, Tr. 28–29, PAGEID #: 86–87; *see also* Doc. 13-9, Tr. 602–754, PAGEID #: 667–819). The ALJ then explained that because Plaintiff was unrepresented, he needed to clarify the issues that needed to be determined in Plaintiff's case, and proceeded to give a thorough explanation. (Doc. 13-2, Tr. 29–30, PAGEID #: 87–88). It was also explained multiple times that the time frame at issue was March 2001 through March 2006, Plaintiff's date last insured. (*Id.*, Tr. 30, 47, PAGEID #: 88, 105).

During the ALJ's questioning of Plaintiff, she testified that her depression, her inability to deal with people, and being "angry all the time" prevented her from being able to work. (*Id.*, Tr. 38, PAGEID #: 96). Specifically, Plaintiff stated that "stupid people" would make her upset and angry. (*Id.*, Tr. 39, PAGEID #: 97). Plaintiff's daughter also testified and agreed that her mom's depression contributed to her inability to work. (*Id.*, Tr. 48, PAGEID #: 106). Plaintiff stated that she saw Dr. Saul for her depression and anger issues, who prescribed Prozac and Xanax, but did not recommend any therapy or counseling. (*Id.*, Tr. 38–39, PAGEID #: 96–97).

Plaintiff also explained that her feet issues, caused by her diabetic neuropathy, presented other limitations and prevented her from working because she could only stand for "a couple hours." (*Id.*, Tr. 40–41, PAGEID #: 98–99). Further, she stated that she had pain in her low back and legs, but explained that surgery relieved her leg pain. (*Id.*, Tr. 42–43, PAGEID #: 100–01).

In terms of daily activities, Plaintiff testified that she is able to drive, split the cooking

responsibilities with her husband, and grocery shop, although her daughter stated she did not grocery shop very often. (*Id.*, Tr. 45, 54, PAGEID #: 103, 112). Plaintiff is unable to do the laundry because it hurts "to bend into the washing machine" and "lift the basket." (*Id.*).

A vocational expert ("VE") testified that if Plaintiff could work at the light exertional level, with the ALJ's proposed limitations, she would be capable of performing her past work as a stapler, as well as other light, unskilled jobs, such as a bagger for garments. (*Id.*, Tr. 60, PAGEID #: 118). The VE also testified that even if limited to sedentary, unskilled jobs, Plaintiff could work as a final assembler, prepare for plated products, or a waxer. (*Id.*, Tr. 60–61, PAGEID #: 118–19). Following the VE's testimony, the ALJ gave Plaintiff an opportunity to ask questions, at which time she explained that she "really didn't understand all that stuff he was saying." (*Id.*, Tr. 62, PAGEID #: 120). The ALJ then explained in detail what the VE's testimony meant and the process following the hearing. (*Id.*, Tr. 62–63, PAGEID #: 121–22).

### C. Relevant Medical Background

*1. Medical Records Provided at the Hearing by Plaintiff*

Plaintiff saw Dr. Kenneth Saul on March 8, 2001, with a reported blood sugar level around 200 to 300 mg/dL. (Doc. 13-9, Tr. 696, PAGEID #: 761). At a follow-up appointment on July 16, 2001, Plaintiff stated that she did not check her blood sugar regularly and indicated she had been feeling "slowed" with no energy. (*Id.*, Tr. 695, PAGEID #: 760).

At another appointment with Dr. Saul on August 6, 2002, Plaintiff reported shortness of breath and chest pain. (*Id.*, Tr. 679, PAGEID #: 745). Following that appointment, Plaintiff had a myriad of tests performed. A radiograph from August 8, 2002, showed left ventricular enlargement, but no evidence of interstitial infiltrate, pulmonary edema, or pleural effusion. (*Id.*,

Tr. 681, PAGEID #: 746). An echocardiogram performed by Dr. R. Keith Pattison on August 22, 2002, revealed no abnormal findings and gave "no obvious explanation for chest pain." (*Id.*, Tr. 666, PAGEID #: 731). A cardiac catheterization performed on September 4, 2002, by Dr. Bruce Fleishman showed angiographically normal coronaries. (*Id.*, Tr. 662, PAGEID #: 727). A stress cardiolite test done by Dr. Fleishman on August 27, 2002 revealed Plaintiff had a fair exercise tolerance and hypertension. (*Id.*, Tr. 676, PAGEID #: 741).

On January 23, 2003, Plaintiff saw Dr. Thomas Skeels for neck pain, arm pain, and paresthesias, after muscle relaxants and Percocet prescribed by Dr. Saul were of "no help." (*Id.*, Tr. 655, PAGEID #: 720). Plaintiff complained of constant neck pain, intermittent pain in the right arm that radiated to the dorsum of the hand, and intermittent left arm pain radiating to the lateral forearm area. (*Id.*). Dr. Skeels noted Plaintiff was in no acute distress, had a normal gait, and had a decreased range of motion in her cervical spine and shoulders with pain at all endpoints of motion. (*Id.*, Tr. 655–56, PAGEID #: 720–21). At the time, x-rays of the cervical spine revealed no osseous abnormalities, there was no disk space narrowing, and x-rays of both shoulders revealed no osseous abnormalities. (*Id.*, Tr. 656, PAGEID #: 721). Dr. Skeels suggested a trial of physical therapy since there was no indication of cervical disk disease and "urged [Plaintiff] to get her diabetes under control because that may be a reason for her pain syndrome." (*Id.*).

On June 4, 2003, Plaintiff again saw Dr. Saul who noted her blood sugar was in the 200's. (*Id.*, Tr. 653, PAGEID #: 718). Then, on July 23, 2003, Plaintiff saw Dr. Victor Stelmack for an evaluation for possible bariatric surgery. (*Id.*, Tr. 647, PAGEID #: 712). At the evaluation, it was noted that with a body mass index of 39, "and several comorbid conditions

either directly related to or exacerbated by her severe obesity," Plaintiff was a "good candidate" for the surgery. (*Id.*). However, it does not appear from the record that Plaintiff underwent bariatric surgery.

At an October 21, 2003 appointment with Dr. Saul, Plaintiff's blood sugar levels were reported in the 400s and 500s, and Prilosec and Lipitor, *inter alia*, were prescribed. (*Id.*, Tr. 642, PAGEID #: 707). Plaintiff again saw Dr. Saul on June 28, 2004, for acute low back pain. (*Id.*, Tr. 637, PAGEID #: 702). Consequently, Dr. Saul ordered an MRI of the lumbar spine, which revealed minimal degenerative changes. (*Id.*, Tr. 635, PAGEID #: 700).

Plaintiff underwent an MRI of the cervical spine on July 5, 2005, which showed mild spondylosis most pronounced at the C3-C4 level, no central canal or foraminal narrowing, and moderately severe left C3-C4 facet arthropathy. (*Id.*, Tr. 596–97, PAGEID #: 661–62).

*2. Medical Records Provided Before the Hearing*

On August 30, 2004, Plaintiff saw Dr. David Sabol for a consultation regarding her hepatitis c diagnosis a few months prior. (Doc. 13-7, Tr. 226, PAGEID #: 289). In a letter, Dr. Sabol noted that Plaintiff had a history of diabetes that she was "currently trying to get under better control," as well as a history of depression for which she was on medication. (*Id.*). A few weeks later, Plaintiff saw Dr. Irene Ryzansky who stated she had poor diabetes control and needed to restart insulin and watch her diet. (*Id.*, Tr. 226, PAGEID #: 289).

Plaintiff underwent a second cardiolite stress test with Dr. Wayne Beaver on November 16, 2004. (*Id.*, Tr. 222, PAGEID #: 285). The test showed that Plaintiff was able to exercise for 7-and-a-half minutes to near-target heart rate without chest pain, and Dr. Beaver stated he "would consider this to be a normal cardiolite stress test." (*Id.*).

6

Two state agency physicians reviewed Plaintiff's records on December 17, 2013, and March 31, 2014, respectively. (Doc. 13-3, Tr. 69, 78, PAGEID #: 128, 137). Both physicians opined that there was "insufficient evidence available during this time period to assess [Plaintiff's] impairments." (*Id.*).

### D. The ALJ's Decision

The ALJ found that since the alleged onset date of disability, Plaintiff has suffered from the following severe impairments: degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, depression, and anxiety. (Doc. 13-2, Tr. 12, PAGEID #: 70). The ALJ also addressed Plaintiff's diabetic neuropathy, chronic obstructive pulmonary disease, and diabetes mellitus, but noted the evidence failed to show these impairments caused more than minimal limitations on Plaintiff, and thus were classified as non-severe. (*Id.*, Tr. 12–13, PAGEID #: 70–71). Specifically, in terms of Plaintiff's diabetes, the ALJ noted that that "[t]he evidence [] fail[ed] to show complaints of ongoing symptoms that could provide functional limitations." (*Id.*, Tr. 13, PAGEID #: 71). When discussing Plaintiff's diabetes mellitus, the ALJ recognized that although the treatment record supported diabetes, with the medications prescribed "the evidence has not shown any corresponding ongoing symptoms or conditions." (*Id.*). Ultimately, the ALJ held that through Plaintiff's date last insured, March 31, 2006, Plaintiff's physical impairments did not meet or medically equal the severity of one of the listed impairments. (*Id.*, Tr. 13, PAGEID #: 71).

When reviewing Plaintiff's mental impairments under listing 12.04 and 12.06, the ALJ opined as follows: Plaintiff had moderate restriction in activities of daily living, as she was unable to do laundry or the dishes, but was able "to prepare food on many days;" Plaintiff had

7

moderate difficulties in social functioning, evidenced by her testimony of her anger issues, but she alleged she was taking proscribed medications Prozac and Xanax; Plaintiff had moderate difficulties with regard to concentration, persistence, or pace, as she had difficulty remembering dates and information had to be explained to her multiple times according to the Social Security field office report; and Plaintiff had not experienced any episodes of decompensation for an extended duration. (*Id.*, Tr. 13–14, PAGEID #: 71–72). Thus, the ALJ found that Plaintiff did not satisfy the "paragraph b" or "paragraph c" criteria. The ALJ also noted that the limitations he identified in the "paragraph b" analysis were incorporated into the residual functional capacity ("RFC") assessment. (*Id.*, Tr. 14, PAGEID #: 72).

As to Plaintiff's RFC, the ALJ stated:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant must not climb ladders, ropes or scaffolds. The claimant can occasionally stoop, crouch, crawl, kneel and climb ramps and stairs. The claimant can perform work that is limited to simple, routine and repetitive tasks; and perform in a work environment free of fast paced production requirements; involving only simple, work-related decisions; and with few, if any work place changes. The claimant can have only brief and superficial interaction with the public and co-workers.

(*Id.*, Tr. 14, PAGEID #: 72). In making this determination, the ALJ stated he had considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (*Id.*).

When reviewing Plaintiff's alleged degenerative disc disease of the lumbar and cervical spine, the ALJ recognized that the evidence supported treatment for neck and lower back pain. (*Id.*, Tr. 15, PAGEID #: 73). However, the ALJ found that the severity of the issues as alleged by Plaintiff was not supported by objective medical evidence:

> [A January 23, 2003 Dr. Skeel] report cited x-rays of the cervical spine that

8

> revealed no osscous abnormalities. The report also noted that an x-ray report of the shoulders did not reveal any abnormalities . . . A January 2004 x-ray report of the lumbar spine revealed only minimal degenerative changes. A July 2005 MRI of the cervical spine revealed mild spondylosis most pronounced at C3-4.

(*Id.*, Tr. 15, PAGEID #: 73). The ALJ relied on these findings, among others, as "strong support for [his] finding to a light level of exertion with postural limitations during this period." (*Id.*).

The ALJ then discussed Plaintiff's mental limitations further, explaining that although she alleged a history of depression, anxiety, and anger issues, she never sought "any medical treatment for these allegations during the period of issue." (*Id.*, Tr. 16, PAGEID #: 74). Indeed, there was no evidence of counseling or therapy. (*Id.*). The ALJ also held that Plaintiff's alleged symptoms and limitations were generally unpersuasive. (*Id.*, Tr. 17, PAGEID #: 75). Specifically, the ALJ noted that in the 2009 functional status evaluation, Plaintiff reported minimal difficulty with self-care, moderate difficulty with sleeping, and no difficulty with social interaction. (*Id.*, Tr. 16, PAGEID #: 74). Yet in a 2010 functional status report, Plaintiff reported no difficulty in self-care, minimal difficulty with social interaction, and state that she was rarely depressed and nervous. (*Id.*, Tr. 16–17, PAGEID #: 74–75). Even with this in mind, the ALJ explained that he still considered Plaintiff's alleged mental impairments in the RFC. (*Id.*).

Finally, the ALJ gave no weight to the state agency medical consultant's opinion "because the state agency consultants did not have the additional evidence that shows medically determinable impairments, which would result in some limitations." (*Id.*, Tr. 17, PAGEID #: 75). Ultimately, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act at any time from the alleged onset date of March 1, 2001 through March 31, 2006. (*Id.*, Tr. 18, PAGEID #: 76).

9

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff alleges only one statement of error—that the ALJ committed harmful legal error in failing to develop a full and fair record and instead erroneously relied on his own lay opinion to formulate a residual functional capacity, without any interpretation, guidance, or opinion from a medical source. (Doc. 14 at 1, 8–10). Specifically, Plaintiff points to the fact that the state agency medical consultants concluded that they had insufficient evidence to determine disability, and the fact that no medical source provided functional limitations. (*Id.* at 7–10). This, according to Plaintiff, is evidence that the ALJ failed to fully develop the record and relied on his own opinion in dereliction of his duty.

### A. Development of the Record

Plaintiff generally "bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits." *E.g.*, *Ford v. Comm'r of Soc. Sec.*, 143 F. Supp. 3d 714, 721 (S.D. Ohio 2015) (citing *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003); *see also* 20 C.F.R. § 404.1512(a)(1) ("In general, you have to prove to us that you are blind or disabled."). However, as Plaintiff points out, "[t]here are a few special circumstances—when a claimant is without counsel, not capable of presenting an effective case, and unfamiliar with hearing procedures—where the ALJ has a special duty to develop the record." *Id.* at 721–22. (quoting *Lambdin v. Comm'r of Soc. Sec.*, 62 F. App'x 623, 625 (6th Cir. 2003)). "The determination of whether an ALJ has failed fully to develop the record in derogation of this heightened responsibility must be determined on a case-by-case basis." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002).

Plaintiff argues this case is one of those "few special circumstances." (Doc. 14 at 8). In particular, she argues that "it is clear from the ALJ's decision and the testimony at the hearing that [she] was not represented in the proceedings before the ALJ," and thus the ALJ had a special duty to develop the record. (*Id.*). It bears reminding though "that a claimant may waive his right to counsel" and that does not in and of itself require a heightened responsibility for the ALJ. *See Nabours*, 50 F. App'x at 275; *see also Talaga v. Comm'r of Soc. Sec.*, No. 1:10-CV-890, 2011 WL 4374590, at *4 (W.D. Mich. Sept. 19, 2011) ("The ALJ's special duty to develop a full and fair record [] does not apply to all unrepresented claimants."). Nevertheless, Plaintiff fails to address the other two factors the Court must consider—whether Plaintiff presented an effective case and whether she was unfamiliar with hearing procedures.

11

After reviewing the record, even without counsel, the undersigned finds that Plaintiff capably presented her case. *See Ford*, 143 F. Supp. 3d at 721. Plaintiff was able to effectively communicate her previous work history, sufficiently articulate the symptoms and limitations that she believed prevented her from being able to work, and supplied additional, relevant medical evidence at the hearing. *See Nabours*, 50 F. App'x at 275–76 (holding that because Plaintiff "was sufficiently articulate in her direct testimony" and "mustered an impressive amount of supporting medical evidence," there was nothing in the record to show the case fell within the "special circumstances arena"). Plaintiff also brought her daughter to the hearing to corroborate her limitations, further showing her effectiveness in presenting her case.

The hearing transcript also reflects the detailed explanations the ALJ gave to Plaintiff and ultimately reflects her grasp of the proceedings. *See Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008). It is clear that this is not a case where an unrepresented Social Security claimant received only a brief, superficial hearing. *Talaga v. Comm'r of Soc. Sec.*, No. 1:10-CV-890, 2011 WL 4374590, at *5 (W.D. Mich. Sept. 19, 2011) (citing *Lashley*, 708 F.2d at 1052 (noting that the ALJ conducted a "brief" 25–minute hearing which was transcribed on 11 pages, and engaged in "superficial questioning" of an elderly claimant with a fifth-grade education who had suffered two strokes, "possessed limited intelligence, was inarticulate, and appeared to be easily confused")). Instead, the ALJ took great care to explain not only the procedure of the hearing to Plaintiff, but also thoroughly explained the overall disability process, which Plaintiff appeared to understand.

Thus, because special circumstances did not exist in this case which triggered the ALJ's special duty to develop the record, Plaintiff bears the burden of proving disability, which she failed to do. *Talaga*, 2011 WL 4374590, at *5.

### B. The ALJ's Formulation of the RFC

Although Plaintiff bears the burden of proving disability, it is still the ALJ's responsibility to ensure the RFC finding is supported by substantial evidence. In her statement of errors, Plaintiff suggests that the RFC was not supported by substantial evidence because the ALJ relied on his own lay opinion. However, it is the ALJ, not a physician, who ultimately determines a claimant's RFC and resolves conflicts in the medical evidence. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009); 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). In doing so, the ALJ is charged with evaluating several factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). The ALJ also has discretion to determine whether additional evidence is necessary. *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)).

Here, the ALJ's RFC was well-supported by both medical evidence and Plaintiff's testimony. The ALJ relied on several x-ray reports and an MRI to determine that Plaintiff's physical impairments still allowed for a light level of exertion. These reports that the ALJ explicitly relied upon were not available to the state agency consultants. Thus, the ALJ

reasonably assigned no weight to the state agency consultants' opinions, because he had significantly more information before him. *See Little v. Comm'r of Soc. Sec.*, No. 2:14-CV-532, 2015 WL 5000253, at *12 (S.D. Ohio Aug. 24, 2015) (holding that substantial evidence supported the ALJ's determination "where the ALJ explicitly assessed state agency reviewer's opinions in light of subsequent record evidence and found that because of that subsequent evidence, the reviewers' opinions about Plaintiff's physical impairments were entitled to no weight").

The ALJ also found that Plaintiff's alleged symptoms and limitations were generally unpersuasive. Although Plaintiff might disagree, the Sixth Circuit has held that the Court must accord great deference to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Further, despite this finding and Plaintiff's failure to seek treatment for her mental health impairments, the ALJ still incorporated mental limitations based on Plaintiff's testimony into the RFC.

Accordingly, the "record as a whole" contains substantial evidence to support the ALJ's RFC decision. *See Berry v. Astrue*, No. 1:09cv000411, 2010 WL 3730983, at *5 (S.D. Ohio June 18, 2010).

## IV. CONCLUSION

For the reasons stated, Plaintiff's Statement of Errors (Doc. 14) is **OVERRULED** and judgment shall be entered in favor of Defendant.

IT IS SO ORDERED.

Date: August 10, 2017                    /s/ Kimberly A. Jolson
                                         KIMBERLY A. JOLSON
                                         UNITED STATES MAGISTRATE JUDGE